UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

**FERNANDO GONZALEZ-TORRES,**

     **Plaintiff,**

**-vs-**

                                              **Case No.  8:11-cv-2553-T-27TGW**

**MARK BUSWELL, et al.,**

     **Defendants.**

_____/

**ORDER**

Before the Court is Defendants' Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. 29), to which Plaintiff has responded (Dkt. 30).  Upon consideration, the motion (Dkt. 29) is GRANTED in part and DENIED in part.

**BACKGROUND**

Plaintiff brought this 42 U.S.C. § 1983 action against Deputies Gary Gobernik and Mark Buswell of the Hillsborough County Sheriff's Office, in their individual capacities, alleging that they violated his Fourth Amendment rights by arresting him without probable cause and using excessive force during the course of the arrest.  Plaintiff further alleges that Deputies Gobernik and Buswell conspired with each other to violate his civil rights.  Deputies Gobernik and Buswell counter that probable cause existed for the arrest, the force they used during the arrest was not excessive, and that, to the extent a constitutional violation occurred, they are entitled to qualified immunity.

## MATERIAL FACTS[1]

Prior to November 15, 2008, Plaintiff purchased two John Deere lawn tractors (Dkt. 30 at p. 22, ¶ 3).[2]  On or about November 15, 2008, Deputy Gobernik went with his fiancé to her mother's (Olga Gonzalez) house (Dkt. 29-1 at pp. 1-2, ¶ 4).  While at house, Deputy Gobernik saw a John Deere tractor inside a shed (Id.).  Deputy Gobernik noticed that the tractor had a security device and sales tag attached to it (Id. at p. 2, ¶ 6).  Deputy Gobernik "thought it was strange that a Home Depot employee would not remove the security device from the tractor before. . ." it was removed from the store, had someone actually purchased it (Id.).  Deputy Gobernik asked Gonzalez where she got the new tractor, and she replied that "it was from [Plaintiff]." (Id. at p.2, ¶ 5).  Plaintiff was Gonzalez's boyfriend at that time, and Deputy Gobernik knew Plaintiff, having met him for the first time approximately six to eight months before (Id. at p. 1, ¶¶ 2, 3).[3]

Deputy Gobernik spoke to his fiancé's family about the tractor, and his fiancé's sister told him that "I'm not sure how [Plaintiff] got [the tractor], but I don't think he bought it."  (Id. at p. 2, ¶ 7).  Gonzalez did not have a receipt or any other documentation indicating that the tractor actually was purchased from Home Depot (Id. at p. 2, ¶ 8).  Deputy Gobernik subsequently saw his fiancé's younger sibling cutting the lawn on the tractor, which still had the security device and sales tag attached to it (Id. at p. 2, ¶ 9).  Deputy Gobernik became concerned that his fiancé's family could be

---

[1]The facts are recited in the light most favorable to Plaintiff.  *See Ross v. Jefferson Cnty. Dep't of Health*, 701 F.3d 655, 658 (11th Cir. 2012) (on summary judgment, the evidence presented must be viewed in the light most favorable to the nonmoving party).

[2]Page numbers cited in reference to exhibits refer to the numbering generated by CM/ECF, rather than the numbering on the original exhibits.

[3]During the six to eight months after Deputy Gobernik first met Plaintiff, he "did not have much contact or interaction with Plaintiff."  (Id. at p. 1, ¶ 3).

blamed and arrested for having a stolen tractor on their property (Id. at p. 2, ¶ 10).  He decided to contact Deputy Buswell "to get a second opinion and possibly look into this matter if he thought it was warranted." (Id. at p. 2, ¶ 11).

On November 17, 2008, at approximately 4:00 or 5:00 p.m., Deputy Gobernik contacted Deputy Buswell and informed him that while he was at Gonzalez's house, he saw the tractor with the security device and sales tag on it, and Gonzalez's family had informed him that Plaintiff brought the tractor to Gonzalez's house (Dkt. 29-2 at pp. 1-2, ¶¶ 2, 4; Dkt. 29-6 at pp. 2-3, 9).[4]  Deputy Gobernik met Deputy Buswell at a Hillsborough County Sheriff's substation (Dkt. 29-6 at p. 2). From there, they drove to Plaintiff's home in Plant City, Florida (Dkt. 29-6 at pp. 2, 4).[5]

Between 5:00 and 6:00 p.m., Deputy Gobernik and Deputy Buswell knocked on the front

---

[4]The record is unclear as to whether prior to contacting Deputy Buswell on November 17, 2008, Deputy Gobernik contacted someone at a Home Depot regarding the tractor.  Deputy Buswell's Incident Report indicates, in pertinent part, that "Dep. Gobernik contacted the Home Depot loss prevention department and he was advised by them that the tractor had been reported stolen from the store in Wesley Chapel." (Dkt. 29-6 at p. 3).  However, neither Deputy Buswell's affidavit nor Deputy Gobernik's affidavit mentions Deputy Gobernik contacting Home Depot prior to contacting Deputy Buswell (Dkts. 29-1, 29-2).  Moreover, the Incident Report does not indicate with whom Deputy Buswell spoke and when (Dkt. 29-6).  Further, the Incident Report indicates that a tractor "from the store in Wesley Chapel" had been reported stolen to the Pasco County Sheriff's Office (Id. at pp. 3, 9), the Deputies' affidavits indicate that they were told that the tractor was stolen from a Zephyrhills Home Depot (Dkts. 29-1 at p. 3, ¶ 15; 29-2 at p. 3, ¶ 16), and Plaintiff's Complaint alleges that he purchased the tractor at a Home Depot in Brandon, Florida (Dkt. 1 at p. 3, ¶ 13).  Lastly, in his affidavit, Deputy Gobernik attests, in pertinent part, that his "only involvement" in the matter "was to provide information of suspicious activity to Deputy Mark Buswell" and that he "had no involvement in the criminal investigation conducted by Deputy Mark Buswell. . . ." (Dkt. 29-1 at p. 4, ¶ 30).

[5]In their affidavits, the Deputies indicate that prior to going to Plaintiff's home, they met at Gonzalez's house, Deputy Buswell saw the tractor and noted its serial number, and Deputy Buswell began investigating the matter by interviewing Gonzalez, and contacting the Hillsborough and Pasco County Sheriff's Offices and the Zephyrhills Home Depot (Dkt. 29-1 at p. 3, ¶¶ 14-15; Dkt. 29-2 at pp. 2-4, ¶¶ 7-22).  Nevertheless, Deputy Buswell's Incident Report indicates that he went to Gonzalez's house and contacted the Home Depot and Sheriff's Offices after he and Deputy Gobernik had arrested Plaintiff (Dkt. 29-6 at p. 4).  Therefore, the Incident Report arguably contradicts the averments in the Deputies' affidavits that Deputy Buswell went to Gonzalez's house, saw the tractor and obtained its serial number, and began investigating whether the tractor had been stolen prior to going to Plaintiff's home and arresting him.

door of Plaintiff's house (Dkt. 30 at p. 23, ¶ 7).[6]  Plaintiff's sister opened the door (Id. at p. 23, ¶ 8). Plaintiff was napping (Id.).  Plaintiff's sister went to the bedroom and told Plaintiff that the police wanted to speak to him (Id. at p. 23, ¶ 9).  Plaintiff went to the door, opened it, and the Deputies entered the house (Id. at p. 23, ¶¶ 10-11; Dkt. 29-6 at p. 4).

When the officers began to speak to Plaintiff, Plaintiff's sister told them she wanted to translate for Plaintiff because he "didn't speak much English."  (Dkt. 30 at p. 23, ¶ 12).  Deputy Gobernik told Plaintiff's sister to "shut up, [Plaintiff] speaks very good English." (Id. at p. 23, ¶ 13). Deputy Buswell told Plaintiff that he wanted to speak to him about a criminal investigation he was conducting and advised Plaintiff of his *Miranda* rights (Dkts. 29-2 at p. 4, ¶ 26; 29-6 at p. 4). Plaintiff responded, "the tractor is mine.  I have paperwork for it."  (Dkts. 29-2 at p. 4, ¶ 27; Dkt. 29-6 at p. 5).[7]  Plaintiff, who at that time was wearing underwear and no pants, told the Deputies that he was going to put on a pair of pants, and started to walk away from the Deputies toward the bedroom (Dkts. 30 at p. 23, ¶ 14; 29-2 at p. 5, ¶ 30; 29-6 at pp. 4-5).  Because Deputy Buswell did not know whether Plaintiff had any weapons in the bedroom, he told Plaintiff "no" and attempted to grab Plaintiff's arm (Dkts. 30 at p. 23, ¶ 15; 29-2 at p. 5, ¶¶ 30-31; 29-6 at p. 4).  Plaintiff,

---

[6]The averments in Deputy Gobernik's affidavit that when he and Deputy Buswell arrived at Plaintiff's home, he initially stayed in his vehicle while Deputy Buswell entered Plaintiff's home (Dkt. 29-1 at p. 3, ¶ 18), are contradicted by both Plaintiff's affidavit (Dkt. 30 at p. 23, ¶ 7), and Deputy Buswell's Incident Report (Dkt. 29-6 at p. 4) ("Writer and Dep. Gobernik (both in full uniform) arrived at [Plaintiff's home] and knocked on the door.  The suspect answered the door and allowed both writer and Dep. Gobernik inside.").

[7]Plaintiff indicates that at that time, he knew that the Deputies were investigating whether Plaintiff had stolen the tractor because after Deputy Gobernik questioned Gonzalez and her daughter about the tractor (apparently on or about November 15, 2008), Gonzalez went to Plaintiff's house and asked for the sales receipt for the tractor (Dkt. 30 at p. 22, ¶¶ 1-2).  According to Plaintiff, he purchased two John Deere tractors, and Gonzalez took the wrong receipt, i.e., she did not take the receipt for the tractor at her house (Id. at p. 22, ¶ 3).  Because Plaintiff could not find the receipt for the tractor at Gonzalez's house, he went the next day to Home Depot and obtained another copy of the receipt, brought it to Gonzalez's house, and gave it to Gonzalez's daughter, Diana Gonzalez (Id. at p. 22, ¶¶ 4-6).

however, "snatched" his arm away from Deputy Buswell, and walked to the bedroom (Dkts. 29-2 at p. 5, ¶ 32; 29-6 at p. 4). Deputy Buswell followed Plaintiff into the bedroom (Id.).

After entering the bedroom, Plaintiff sat in a chair (Dkts. 30 at p. 23, ¶ 16; 29-2 at p. 5, ¶ 33; 29-6 at p. 4). Deputy Buswell told Plaintiff that he was under arrest (Dkts. 30 at p. 23, ¶ 17; 29-2 at p. 5, ¶ 34; 29-6 at p. 4). Plaintiff responded that he did not do anything wrong, and did not get up from the chair (Dkt. 30 at p. 23, ¶ 18). Immediately thereafter, Deputy Gobernik jumped on Plaintiff and placed him in a choke hold, and Deputy Buswell tased Plaintiff in the area around his groin (Id. at p. 23, ¶ 19). Deputy Gobernik's choke hold rendered Plaintiff unconscious (Dkt. 29-5 at p. 11, Interrogatory No. 11). The Deputies held Plaintiff down on a bed and placed him in handcuffs (Dkts. 29-2 at p. 5, ¶ 36; 29-1 at p. 4, ¶ 23). Plaintiff did not resist the Deputies (Dkt. 29-5 at p. 9, Interrogatory No. 8).

Plaintiff was escorted to a squad car (Dkt. 30 at p. 24, ¶ 21). While Plaintiff was in the car, Deputy Gobernik told Plaintiff that he was "in big trouble" and was going to be deported to Mexico (Id. at p. 24, ¶ 22). Deputy Buswell asked Deputy Gobernik what he wanted him to do with Plaintiff, to which Deputy Gobernik replied "do whatever you want." (Id. at p. 24, ¶¶ 23, 24).

Plaintiff was transported to Orient Road Jail by Deputy Jennifer Sands (Dkts. 29-2 at p. 6, ¶ 42; 29-8).[8] To the best of Deputy Sands' recollection, Plaintiff did not complain to her of any injuries, and she saw no visible signs of injury (Dkt. 29-8 at p. 2, ¶¶ 5-6). At the jail, Deputy Sands completed a report which indicated, in pertinent part, that Plaintiff did not have any signs or complaints of injury requiring medical attention (Id. at p. 2, ¶¶ 7-9; p. 6). Plaintiff did have visible red marks on his neck (Dkt. 29-5 at p. 10, Interrogatory No. 9). The Hillsborough County Sheriff's

---

[8]Deputy Sands' surname was Bradbeer at the time of the arrest (Dkt. 29-8).

5

Office Health Maintenance Record indicates, in pertinent part, that when Plaintiff was initially medically screened at the jail, Plaintiff denied having any medical, mental, or dental health issue requiring treatment (Dkt. 29-9 at p. 3). Plaintiff, however, states that while he was at the jail, he was not taken to a "medical examiner" for a medical examination (Dkt. 29-5 at p. 12, Interrogatory No. 13).

After Plaintiff was arrested and transported to the jail, Deputies Gobernik and Buswell went to Gonzalez's house (Dkt. 29-6 at pp. 2, 4). They located the tractor in a shed (Id. at p. 4). Gonzalez told Deputy Buswell that approximately one month earlier, her tractor lawnmower broke down (Id. at p. 5). She also told him that Plaintiff told her that he would get her a new tractor, and that a couple of days later, Plaintiff delivered the new tractor to her house (Id.). She stated that she did not know where Plaintiff got the tractor, did not know that it was stolen, and had not noticed the security device and sales tag on the tractor (Id.).

Deputy Buswell then obtained the tractor's serial number, GXA115C01190 (Dkt. 29-2 at p. 2, ¶ 12). He contacted the Hillsborough County Sheriff's Office (HCSO) to ascertain whether the tractor had been reported stolen (Dkts. 29-6 at p. 4; 29-2 at pp. 2-3, ¶ 13). The HCSO, however, advised Deputy Buswell that it did not have a report that a tractor with that serial number had been stolen (Id.). Deputy Buswell next contacted the Pasco County Sheriff's Office (PCSO), which also advised Deputy Buswell that it did not have a report that a tractor with that serial number had been reported stolen (Dkts. 29-6 at p. 4; 29-2 at p. 3, ¶ 14). PCSO did have a report, Report # 08-062445-01, which indicated that on October 14, 2008, the Home Depot in Zephyrhills, Florida, reported that a John Deere lawnmower with serial number GXA115C011089 had been stolen (Dkt. 29-4 at pp. 1-2).

After speaking with the PCSO, Deputy Buswell spoke to a manager, David Crowthers, at the Zephyrhills Home Depot (Dkts. 29-6 at p. 4; 29-2 at p. 3, ¶ 15; 29-3 at pp. 1-2, ¶ 4).  Crowthers compared the serial number on the tractor in Gonzalez's shed to "information in the Home Depot database"[9] and confirmed that the tractor was one of multiple tractors that had been recently stolen from the Zephyrhills Home Depot, and reported to the PCSO (Dkts. 29-6 at p. 4; 29-2 at p. 3, ¶ 16; 29-3 at p. 2, ¶ 6).[10]  Deputy Buswell informed Crowthers that the PCSO's report did not indicate that a tractor with serial number GXA115C01190 had been stolen, and "advised [Crowthers] to recontact [PCSO] to make sure the tractor was reported stolen."  (Dkts. 29-6 at p. 4; 29-2 at p. 3, ¶ 19; 29-3 at p. 2, ¶ 7).[11]  Crowthers contacted the PCSO the next day, November 18, 2008, and informed Deputy Adam Gonzalez that the correct serial number for "one of the stolen John Deere riding mowers in their report" was GXA115C01190 (Dkts. 29-3 at p. 2, ¶ 8; 29-4 at pp. 3-4).

Plaintiff was charged with grand theft over $300.00, resisting arrest with violence, and two counts of battery on a law enforcement officer (Dkt. 29-6 at p. 8).   The Court takes judicial notice of the Hillsborough County Clerk of Court progress docket for Case # 08-cf-022522 showing that

---

[9]Defendants have not proffered the "information in the Home Depot database" on which Crowthers allegedly relied to conclude that the tractor with serial number GXA115C01190 had been stolen.

[10]Although in their affidavits Crowthers and Deputy Buswell attest that multiple tractors/mowers had been reported stolen (Dkts. 29-2 at p. 3, ¶ 1; 29-3 at p. 1, ¶ 2, p. 2, ¶ 6), the PCSO report indicates that only one tractor/mower had been stolen (Dkt. 29-4).

[11]In his affidavit, Deputy Buswell attests, in pertinent part, that after speaking with Crowthers, he contacted the HCSO Auto Theft Section, and advised them of the information he obtained regarding the tractor in Ms. Gonzalez's shed (Dkt. 29-2 at pp. 3-4, ¶ 20).  Deputy Buswell avers that "Auto Theft agreed that [he] had probable cause to believe that Plaintiff had committed a grand theft. . . [and] suggested that [he] go and speak with Plaintiff to see what he had to say about this situation. . . ." (Id. at p. 4, ¶¶ 21-22).  However, viewing all the evidence in the record in the light most favorable to Plaintiff, Deputy Buswell's conversation with the Auto Theft Section occurred after he arrested Plaintiff (see Dkt. 29-6).

the State Attorney filed a Letter of Release on June 6, 2009, dropping the charges against Plaintiff.[12]

Fed.R.Evid. 201.

As a result of the incident with Deputies Gobernik and Buswell, Plaintiff experienced hypertension, anxiety, and depression, and was diagnosed as suffering from post-traumatic stress (Dkt. 29-5, p. 12, Interrogatory No. 13; p. 13, Interrogatory No. 15).  He received treatment for these ailments from psychologists and psychiatrists (Id. at p. 12, Interrogatory No. 13).  As a result of his ailments, Plaintiff lost his towing business (Id. at p. 13, Interrogatory No. 15; p. 8, Interrogatory No. 5).

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper if, following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id*. at 1260. All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

---

[12]A "letter of release" indicates that the State Attorney's Office has declined to prosecute charges against a defendant.  *See, e.g., Crosier v. Sec'y, Dep't of Corr.*, 2010 U.S. Dist. LEXIS 121653, at *7 (M.D. Fla. Nov. 1, 2010).

Once a party properly makes a summary judgment motion by demonstrating the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24.  The evidence must be significantly probative to support the claims.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact.  *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003). Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable jury could find for the non-moving party.  *Id*.

Qualified immunity is a question of law for the courts, even when asserted on summary judgment. *See Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). As the Eleventh Circuit has stated:

> The objective nature of qualified immunity defines what fact issues are material for summary judgment purposes. To avoid summary judgment it is not enough for a plaintiff to produce evidence, which — if believed (for summary judgment its truth is assumed) — would allow a fact-finder to find just that the government-agent defendant was, in reality, wrong about the facts on which the defendant acted. Instead, to defeat summary judgment because of a dispute of material fact, a plaintiff facing qualified immunity must produce evidence that would allow a fact-finder to find that no reasonable person in defendant's position could have thought the facts were such that they justified defendant's acts.

*Post v. City of Ft. Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993) (citing *Sims v. Metropolitan Dade County*, 972 F.2d 1230, 1234-35 (11th Cir. 1992)).

## DISCUSSION

Defendants contend that they are entitled to qualified immunity on all of Plaintiff's claims. "[G]overnment officials performing discretionary functions generally are shielded from liability for

civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  As such, qualified immunity allows officials to "carry out their discretionary duties without fear of personal liability or harassing litigation[.]"  *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal citations omitted). "[O]nly in exceptional circumstances will government actors have no shield against claims made against them in their individual capacities." *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc) (citations and emphasis omitted).  Because qualified immunity is "immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985),  its purposes would be "thwarted if a case is erroneously permitted to go to trial."  *Baltimore v. City of Albany, Georgia*, 183 Fed. App'x 891, 895 (11th Cir. 2006) (unpublished) (citations and quotations omitted).

To receive qualified immunity, a public official must first prove that he was acting within the scope of his discretionary authority during the events in question.  *Ferraro*, 284 F.3d at 1194. There is no dispute that Deputy Buswell was acting within the scope of his discretionary authority in investigating a possible theft, and when arresting Plaintiff.

With respect to Deputy Gobernik, however, there is a dispute as to whether he was acting within the scope of his discretionary authority.  Deputy Gobernik argues that he "was acting within his discretionary authority" because he was "merely providing information of suspicious activity and assisting Deputy Buswell [to] gain control of Plaintiff who was resisting after being placed under arrest."  (Dkt. 29 at p. 23).  Plaintiff disagrees, and argues that Deputy Gobernik was not acting within the scope of his discretionary authority because he "did not have any arresting authority. . ." (Dkt. 30 at p. 5).

10

"To establish that the challenged actions were within the scope of his discretionary authority, a defendant must show that those actions were (1) undertaken pursuant to the performance of his duties, and (2) within the scope of his authority. [ ] To that end, a court must ask whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Gray ex. rel. Alexander v. Bostic*, 458 F.3d 1295, 1303 (11th Cir. 2006) (internal citation omitted); *see also Holloman ex. rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). "[T]o pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, but for the alleged constitutional infirmity, would have fallen with his legitimate job description." *Harland*, 370 F.3d at 1266. "After determining that an official is engaged in a legitimate job-related function, it is then necessary to turn to the second prong of the test and determine whether he is executing that job-related function -- that is, pursuing his job-related goals in an authorized manner." *Id.*

At the time of the incident, Deputy Gobernik was a detention deputy in the Judicial Protection Bureau (Dkt. 29-1 at p. 1, ¶ 1), and serving as a bailiff at the Thirteenth Judicial Circuit Court in Hillsborough County (Id. at p. 2, ¶ 12). As a bailiff assigned to a courthouse, it would appear that Deputy Gobernik's duties would have been to provide security for the courtrooms and judges. See Section 29.008(1)(e), Fla. Stat. (2013) (term "security" includes "bailiffs while providing courtroom and other security for each judge and other quasi-judicial officers."). Escorting Deputy Buswell to Plaintiff's home, and assisting Deputy Buswell in the apprehension and arrest of Plaintiff, would not have fallen within Plaintiff's legitimate job description.[13]

---

[13]Viewing the evidence in the light most favorable to Plaintiff, Deputy Gobernik did not merely provide information of suspicious activity to Deputy Buswell, and assist Deputy Buswell in gaining control of Plaintiff while he was resisting arrest. Rather, he participated in the investigation, arrest, and apprehension of Plaintiff by

Accordingly, Deputy Gobernik has not proven that he acted within his discretionary authority. He is not, therefore, entitled to qualified immunity. *See Ferraro*, 284 at 1194 ("If the defendant was not acting within his discretionary authority, he is ineligible for the benefit of qualified immunity.").

With respect to Deputy Buswell, if Plaintiff can establish that Deputy Buswell violated Plaintiff's clearly established constitutional rights, he is not entitled to qualified immunity, even though he was acting within his discretionary authority. Once a showing of discretionary authority is established, the burden shifts to the plaintiff to show that qualified immunity should not apply. *Lewis v. City of W. Palm Beach, Fla.*, 561 F.3d 1288, 1291 (11th Cir. 2009). First, a plaintiff must show that, considered in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If no constitutional right was violated, the defendant is entitled to qualified immunity.[14] If the facts establish a constitutional violation, a plaintiff must then show that, at the time of the incident, "every reasonable police officer would have realized the acts violated already clearly established federal law." *Garrett v. Athens-Clarke Co.*, 378 F.3d 1274, 1278-79 (11th Cir. 2004) (citing *Saucier*, 533 U.S. at 201-02).

---

questioning Gonzalez's family regarding the tractor, contacting Deputy Buswell and leading him to Plaintiff's home to question Plaintiff, and placing a choke hold on Plaintiff and removing him from the chair so that Deputy Buswell could handcuff Plaintiff.

[14]When a plaintiff fails to establish a constitutional violation, any facts still in dispute are rendered immaterial. *See Bennett v. Parker*, 898 F.2d 1530, 1532 (11th Cir. 1990). That is, "[i]f the facts taken in the light most favorable to the plaintiff do not establish a constitutional violation, then the public official should be granted summary judgment as a matter of law." *Id*. (citing *Brown v. Smith*, 813 F.2d 1187, 1188 (11th Cir. 1987)).

A. False Arrest

An arrest does not violate the Fourth Amendment so long as a police officer has probable cause for the arrest. *See, e.g., Wood v. Kesler*, 323 F.3d 872, 878 (11th Cir. 2003).  Probable cause exists if "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Von Stein v. Brescher*, 904 F.2d 572, 578 (11th Cir. 1990) (emphasis added). "Probable cause requires more than mere suspicion, but does not require convincing proof." *Bailey v. Board of County Comm'rs of Alachua County*, 956 F.2d 1112, 1120 (11th Cir. 1992).

When an officer asserts qualified immunity, the issue is not whether probable cause existed in fact, but whether the officer had "arguable" probable cause to arrest. *Moore v. Gwinnett County*, 967 F.2d 1495, 1497 (11th Cir. 1992). That is, the officer is entitled to qualified immunity if a reasonable officer "could have believed probable cause existed." *Id.*; *see United States v. Clark*, 559 F.2d 420, 425 (5th Cir. 1977) (stating that "even if the officers felt that probable cause was lacking, an objective standard would still be applicable").[15] Moreover, "[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (internal quotations omitted).[16]

Whether an officer possesses arguable probable cause depends on the elements of the alleged

---

[15] "[T]he question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to the underlying intent or motivation. . . .It must be judged from the perspective of a reasonable officer on the scene, rather than with 20/20 vision of hindsight." *Kesinger*, 381 F.3d at 1248 (citations omitted).

[16] "[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and ... in such cases those officials. . .should not be held personally liable." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987).

crime and the operative facts. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137-38 (11th Cir. 2007). A showing of arguable probable cause does not, however, require proof of every element of a crime. *Scarbrough v. Myles*, 245 F.3d 1299, 1302-03 (11th Cir. 2001). If the arresting officer had arguable probable cause to arrest for any offense, qualified immunity applies. *Skop*, 485 F.3d at 1138.

Plaintiff was arrested for grand theft, resisting arrest with violence, and battery on a law enforcement officer (Dkt. 29-6 at p. 8). Defendants contend that there was probable cause to arrest Plaintiff not only for those offenses, but for resisting arrest without violence and attempted battery on a law enforcement officer as well (Dkt. 29 at pp. 12-15).

Under Florida law, to prove the offense of battery on a law enforcement officer (or attempted battery on a law enforcement officer), the prosecutor would be required to prove that Plaintiff intentionally touched or struck (or attempted to touch or strike) either Deputy Buswell or Deputy Gobernik against their will, or intentionally caused bodily harm to them. See Fla. Stat. §§ 784.03(1)(a), 784.07(2)(b). To prove the offense of resisting arrest with violence, the prosecutor would have to prove that Plaintiff knowingly, intentionally, and unlawfully resisted Deputy Buswell or Deputy Gobernik by offering to do violence or doing violence to them while they were engaged in the lawful execution of a legal duty. Fla. Stat. § 843.01; *O'Brien v. State*, 771 So. 2d 563, 564 (Fla. 4th DCA 2000).

On this record, there is evidence sufficient to create a genuine issue of material fact as to whether there was arguable probable cause to arrest Plaintiff for resisting arrest with violence, battery on a law enforcement officer, or attempted battery on a law enforcement officer. Although Defendants attest that while they were removing Plaintiff from the chair, he kicked at them and "threw himself into Deputy Gobernik," Plaintiff avers that he did not resist the officers in any way

14

(Dkt. 29-5 at p. 9, Interrogatory No. 8).  Plaintiff's version of the events must be accepted as true at this stage of the proceedings.  *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (in ruling on a motion for summary judgment, all the evidence and factual inferences reasonably drawn from the evidence must be viewed in a light most favorable to the nonmoving party).

The record also reveals genuine issues of material fact about whether the officers had arguable probable cause to arrest Plaintiff for grand theft.  "Under Florida law, a person commits the felony offense of grand theft, *inter alia*, where he knowingly obtains or uses the property of another with the intent to permanently or temporarily deprive the person of a right to the property and causes damage to the property in excess of $300."  *Adams v. City of Ormond Beach*, 514 Fed. Appx. 952, 955 (11th Cir. 2013) (unpublished) (citing Fla.Stat. § 812.014(1)-(2)).

Defendants argue that there was probable cause to arrest Plaintiff for theft of the tractor because prior to the arrest: 1) they saw that the tractor still had a security device and sales tag attached to it; 2) Gonzalez told them that Plaintiff had given the tractor to her; 3) Gonzalez's daughter told Deputy Gobernik that "I'm not sure how [Plaintiff] got it, but I don't think he bought it"; and 4) Deputy Buswell spoke to Crowthers who confirmed that the serial number on the tractor in Gonzalez's shed matched the serial number of a tractor that was reported as stolen from a Home Depot (Dkt. 29 at p. 12).   However, viewing the evidence in the light most favorable to Plaintiff, Deputy Buswell contacted Crowthers (and HCSO, HCSO's Auto Theft Division, PCSO, and Gonzalez) *after* he and Deputy Gobernik went to Plaintiff's home and arrested him.  Therefore, prior to Plaintiff's arrest, the Deputies knew only that the tractor at Gonzalez's home had a security device and sales tag attached to it, Gonzalez told them Plaintiff gave her the tractor, and Gonzalez's daughter said that she did not think Plaintiff bought the tractor.

A reasonable jury could find that at the time of the arrest Defendants did not have arguable probable cause to believe that Plaintiff committed grand theft.  Although prior to arresting Plaintiff, the Defendants knew that the tractor still had a security device attached to it, and Gonzalez's daughter stated that she did not believe Plaintiff paid for it,[17] at that point, a reasonable officer would investigate further to determine if the tractor had actually been reported as stolen.  This is especially true when the investigation into whether the tractor was stolen only required the Deputies to contact the Home Depot store that apparently was identified on the sales tag attached to the tractor.  *See Adams*, 514 Fed. Appx. at 955 ("An officer's lack of corroboration through independent police work is noteworthy in the probable cause analysis.") (citing *Kingsland v. City of Miami*, 382 F.3d 1220, 1229 (11th Cir. 2004)).

Moreover, prior to the arrest, Plaintiff told Deputy Buswell that "the tractor is mine.  I have paperwork for it." (Dkt. 29-2 at p. 4, ¶ 27).  Although Deputy Buswell attests that Plaintiff "never offered to show me the paperwork to prove that he bought it" (Id.), there is no evidence that Deputy Buswell asked Plaintiff to show him the paperwork, or gave him a reasonable opportunity to show him the paperwork.  After Plaintiff stated that "the tractor is mine" and he had "paperwork" for it, a reasonable officer would have requested the documentation prior to arresting Plaintiff.  *See, e.g., Bishop v. Best Buy, Co.*, 2010 U.S. Dist. LEXIS 110631, at *35 (S.D.N.Y. Oct. 13, 2010) (where a reasonable officer was warranted in believing that a theft might have occurred, Plaintiff's sales receipt had bearing on that offense).

Lastly, the record evidence demonstrates genuine issues of material fact about whether the

---

[17]Defendants do not offer any evidence or argument showing that Gonzalez's daughter had an objectively reasonable basis to believe that Plaintiff did not purchase the tractor.

officers had arguable probable cause to arrest Plaintiff for resisting arrest without violence. To prove the offense of resisting arrest without violence, the prosecutor would have to prove that Defendants were engaged in the lawful execution of an arrest or other legal duty, and that Plaintiff's actions constituted obstruction of or resistance to that lawful duty. *See Storck v. City of Coral Springs*, 354 F.3d 1307, 1315 (11th Cir. 2003) (citations omitted). "Legal duties" encompass more than just making arrests. *See Jacobson v. State*, 476 So. 2d 1282, 1287 (Fla. 1985) ("[S]ection 843.02. . . does not require that the officer be attempting to arrest the suspect."). "Examples of the lawful execution of a legal  duty include. . .serving process[,]. . .legally detaining a person[,]. . .asking for assistance in an emergency situation[,]" and investigating a 911 call. *A.R. v. State*, 127 So. 3d 650, 654 (Fla.4th DCA 2013).

Defendants argue that there was probable cause to arrest Plaintiff for resisting arrest without violence because Plaintiff pulled his arm away from Deputy Buswell's grasp and walked toward the bedroom after being instructed not to do so, and failed to get out of the chair after being placed under arrest (Dkt. 29 at p. 14). The first question, therefore, is whether Deputy Buswell was "legally detaining" Plaintiff when he grabbed Plaintiff by the arm and told him not to go into the bedroom. If not, there was no probable cause to arrest Plaintiff for resisting arrest without violence, because Deputy Buswell would not have been exercising a legal duty at the time Plaintiff pulled his arm away and walked to the bedroom.

Deputy Buswell asserts that he instructed Plaintiff not to go into the bedroom and attempted to grab Plaintiff's arm because he was concerned for his, Deputy Gobernik, and Plaintiff's mother's safety, since he did not know what Plaintiff's "intentions were for going into the bedroom and because [he] did not know whether [Plaintiff] had any weapons in the bedroom." (Dkt. 29-2 at p.

5, ¶¶ 30-31).  The nature of this encounter, therefore, determines whether Deputy Buswell was "legally detaining" Plaintiff.  The undisputed facts indicate that the encounter was analogous to a "knock and talk" investigation.

A "knock and talk" is an "investigative technique whereby an officer knocks on the door to a residence and attempts to gather information by explaining to the occupants the reason for the police interest."  *United States v. Norman*, 162 F. App'x 866, 869 (11th Cir. 2006) (per curiam). During a "knock and talk" investigation, "citizens are free not to cooperate with" the investigation, and, "absent a warrant, police *cannot detain them*, demand entry into their homes, or otherwise compel their cooperation unless an exception to the warrant requirement applies."  *United States v. Butler*, 405 Fed. Appx. 652, 656-657 (3d Cir. 2010) (unpublished) (citation omitted) (emphasis added).[18]  An exception to the warrant requirement is exigent circumstances.  *See Brown v. Passmore*, 445 Fed. Appx. 187, 188-189 (11th Cir. 2011) (unpublished) (a "search or seizure [without a warrant] is lawful 'only when some exception to the warrant requirement—such as consent or exigent circumstances—exists.'") (quoting *Bates v. Harvey*, 518 F.3d 1233, 1239 (11th Cir. 2008)).

"Exigent circumstances exist 'when there is compelling need for official action and no time to secure a warrant.'"  *United States v. Burch*, 466 Fed. Appx. 772, 774 (11th Cir. 2012) (unpublished) (quoting *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002)).  Factors indicating exigent circumstances include:

---

[18]When officers are lawfully executing a search warrant, they may temporarily detain the occupants of the residence to ensure officer safety.  *Michigan v. Summers*, 452 U.S. 692, 701-03 (1981); *United States v. Lewis*, 674 F.3d 1298, 1308 n. 6 (11th Cir.  2012) ("the Supreme Court has held that officers executing a search warrant may lawfully detain the occupants of the premises. . .").  Defendants, however, were not executing a search warrant. Rather, by their own admission, they went to Plaintiff's home "to speak with [Plaintiff] about a criminal investigation. . . ." (Dkt. 29-2 at p. 4, ¶ 26).

18

(1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) a reasonable belief that the suspect is armed; (3) probable cause to believe that the suspect committed the crime; (4) strong reason to believe that the suspect is in the premises being entered; (5) a likelihood that delay could cause the escape of the suspect or the destruction of essential evidence, or jeopardize the safety of officers or the public.

*Id.* (citing *United States v. Standridge*, 810 F.2d 1034, 1037 (11th Cir. 1987)).

Defendants have presented no evidence or facts indicating that they reasonably believed that Plaintiff had committed a grave or violent offense, was armed or dangerous, had weapons in the house, or would escape, destroy evidence, or jeopardize anyone's safety. Moreover, viewing the evidence in the light most favorable to Plaintiff, when Defendants were at Plaintiff's home, they did not have probable cause to believe Plaintiff had committed grand theft or any other offense. Therefore, Deputy Buswell's attempt to detain Plaintiff was not justified under the exigent circumstances exception to the warrant requirement. *Cf. Adams v. Williams*, 407 U.S. 143, 145-47 (1972) (holding that an officer can forcibly stop a suspect, even if no probable cause exists, to investigate a reliable informant's tip that the suspect is armed and dangerous); *United States v. Acosta*, 363 F.3d 1141, 1147 (11th Cir. 2004) ("officers may take reasonable steps to ensure their safety so long as they possess '*an articulable and objectively reasonable belief that the suspect is potentially dangerous*.'") (quoting *Michigan v. Long*, 463 U.S. 1032, 1051 (1983)) (emphasis added).

Because Deputy Buswell was not "legally detaining" Plaintiff when he attempted to grab Plaintiff and told him not to go into the bedroom, Deputy Buswell was not engaged in the lawful execution of a legal duty. Therefore, there was no probable cause to arrest Plaintiff for resisting an officer without violence.

19

Defendants' argument that there was probable cause to arrest Plaintiff for resisting arrest without violence because Plaintiff failed to get out of the chair after being told he was under arrest likewise fails.   Prior to informing Plaintiff that he was under arrest, Defendants did not have probable cause to arrest Plaintiff for either grand theft or resisting arrest.   Therefore, Plaintiff was entitled to resist the arrest without violence.  *See Jay v. State*, 731 So. 2d 774, 777 (Fla. 4th DCA 1999) ("Absent a lawful arrest for obstruction, Jay was free to resist such an arrest without violence.").

In sum, based on the facts construed for summary judgment purposes, Plaintiff's arrest was without probable cause, and Defendants therefore did not have arguable probable cause to arrest him. These actions were therefore a violation of Plaintiff's Fourth Amendment rights.

Because Plaintiff's Fourth Amendment rights were violated, it must now be determined whether the right was clearly established.  *Garrett v. Athens-Clarke Co.*, 378 F.3d at 1278-79.  At the time of Plaintiff's arrest, it was "clearly established that an arrest made without probable cause violates the Fourth Amendment."  *Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998). Therefore, Deputy Buswell is not entitled to qualified immunity for Plaintiff's claim that the arrest was not supported by probable cause.

B. Excessive Force

To the extent Plaintiff asserts that Defendants' use of force during the arrest was excessive as unsupported by probable cause, that claim is subsumed within his false arrest claim.  *See Bowens v. Superintendant of Miami S. Beach Police Dep't*, 2014 U.S. App. LEXIS 3020, at *14 (11th Cir. Feb. 19, 2014) ("'Any force used in an illegal arrest is necessarily excessive,' but 'a claim that any force in an illegal . . . arrest is excessive is subsumed in the illegal . . . arrest claim and is not a

discrete excessive force claim.'") (quoting *Bashir v. Rockdale Cnty., Ga.*, 445 F.3d 1323, 1331-32 (11th Cir. 2006)).

In addition to asserting that the use of force during his arrest was illegal because it was not supported by probable cause, Plaintiff also alleges that Defendants' force was excessive, assuming his arrest was legal. Plaintiff bases this excessive force claim on two grounds: 1) Deputy Gobernik jumped on him and used a choke hold, rendering him unconscious; and 2) Deputy Buswell used his taser on Plaintiff.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee v. Ferraro*, 284 F.3d 1188, 1197 (11th Cir. 2002). "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). Nevertheless, the force used to effectuate an arrest must be "reasonably proportionate to the need for that force." *Id*. at 1198.

"In determining the reasonableness of the force applied, [courts] look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." *Morton v. Kirkwood*, 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)). Factors utilized to determine reasonableness include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Lee*, 284 F.3d at 1198. Additional considerations include the need for the

application of force, the relationship between the need and the amount of force used, the extent of

the injury inflicted, and whether the force was applied in good faith or maliciously and sadistically.

*Hadley v. Gutierrez*, 526 F.3d 1324, 1329 (11th Cir. 2008).

Accepting Plaintiff's version of the facts as true, Plantiff was sitting in a chair in his bedroom

when Deputy Buswell told him that he was under arrest.  Plaintiff responded by saying that he had

done nothing wrong, and remained seated in the chair.  Immediately thereafter, Deputy Gobernik

jumped on Plaintiff and placed him in a choke hold, and Deputy Buswell used his taser on Plaintiff.

Plaintiff did not resist the Deputies, and was rendered temporarily unconscious.  Deputy Gobernik

put Plaintiff on a bed, while Deputy Buswell placed handcuffs on Plaintiff.  Plaintiff had visible red

marks on his neck from Deputy Gobernik's choke hold.

Viewing the facts in a light most favorable to Plaintiff, a reasonable jury could conclude that

jumping on Plaintiff and applying a choke hold on him, to the point that Plaintiff was rendered

unconscious, and using a taser, constituted excessive force.  The crime Plaintiff was suspected of

committing was a non-violent offense.  Further, Plaintiff did not pose an immediate threat to anyone

as he was unarmed, wearing only his underwear, not acting violently, and sitting in a chair.

Although after Deputy Buswell told Plaintiff that he was under arrest, Plaintiff responded by stating

that he did not do anything warranting an arrest, Plaintiff's version of the events shows that the

Deputies did not give Plaintiff sufficient time to comply with any order to get up from the chair

before Deputy Gobernik jumped on him and placed him in a choke hold, and Deputy Buswell used

his taser.  "[U]nprovoked force against a non-hostile and non-violent suspect who has not disobeyed

instructions violates that suspect's rights under the Fourth Amendment."  *Fils v. City of Aventura*,

647 F.3d 1272, 1289 (11th Cir. 2011).

Moreover, under Plaintiff's version of the events, a reasonable jury could conclude that the amount of force the Deputies used was not "reasonably proportionate to the need for that force." *Lee*, 284 F.3d at 1198. "[N]on-violent suspects, accused of minor crimes, who have not resisted arrest. . .are victims of constitutional abuse when police used extreme force to subdue them." *Fils*, 647 F.3d at 1289. Although use of a taser or a choke hold during the course of arrest does not violate the Fourth Amendment per se, *see Fils*, 647 F.3d at 1289; *Armer v. Marshall*, 2011 U.S. Dist. LEXIS 70242, at *11 (W.D. Ky. June 28, 2011) ("[A] guard's use of a choke hold to bring a [sic] unruly, disruptive, or fleeing prisoners under control is not per se excessive force.") (citations omitted), such force is not appropriate unless "an officer reasonably believes the suspect is violent" or the "suspect appears 'hostile, belligerent, and uncooperative. . . .'" *Fils*, 647 F.3d at 1289-90.

Under Plaintiff's version of events, Plaintiff was not violent, posed no safety risk to the Deputies or others, did not physically resist the Deputies during the arrest, and was not given a sufficient opportunity to comply with Deputy Buswell's order to submit to an arrest prior to the Deputies using force on him. A reasonable jury could reasonably find that tasing Plaintiff, and applying a choke hold on him until he was unconscious, violated Plaintiff's Fourth Amendment rights.

Defendants attempt to extinguish Plaintiff's excessive force claim by arguing that "all evidence in this matter completely contradicts" Plaintiff's allegations that Deputy Buswell used his taser on Plaintiff, and Deputy Gobernik applied a choke hold on Plaintiff, rendering him unconscious (Dkt. 29 at p. 17). In support of their argument, Defendants assert that Plaintiff: 1) never complained of any use of force or injury suffered during the arrest to Deputy Sands while she was transporting him to the jail; 2) denied having suffered any recent loss of consciousness or other injury when he

was screened by medical staff at the jail; and 3) claims to have merely suffered red marks on his neck during the arrest (Id. at pp. 17-18).  Defendants further argue that even if Plaintiff was placed in a choke hold and tased, the force was *de minimis* and therefore constitutional (Id. at pp. 19-20).

To the extent Defendants argue that the force used during the arrest was *de minimis*, they appear to contend that use of a choke hold and taser during the course of *any* arrest is *de minimis* force and constitutional (Id.).  This argument, however, is adverse to *Graham* which states, in pertinent part, that "the test for reasonableness under the Fourth Amendment. . .requires careful attention to the facts and circumstances of each particular case. . . ."  *Id*., 490 U.S. at 396.  *See also McKenney v. Harrison*, 635 F.3d 354, 364 (8th Cir. 2011) ("[T]he use of tasers requires sufficient justification for their use to be reasonable.").  In Plaintiff's case, a reasonable jury could find that use of a taser and choke hold was unnecessary, and therefore unreasonable.

To the extent Defendants argue that Plaintiff's assertion that he was tased and placed in a choke hold is "blatantly contradicted by the record" because Plaintiff complained of no pain or injury during his transport to the jail, the jail medical records reveal that he complained of no pain, injury, or recent loss of consciousness when he arrived at the jail, and claims that he suffered only red marks on his neck during the arrest (Id. at pp. 17-19), there is a disputed issue of material fact on that.  Plaintiff states in his affidavit and answer to Defendants' Interrogatory No. 11 that Deputy Gobernik jumped on him and put him in a choke hold, and Deputy Buswell tased him  (Dkt. 30 at p. 23, ¶ 19; Dkt. 29-5 at p. 11, Interrogatory No. 11).  Plaintiff further states in his answers to interrogatories that as a result of the force used during the arrest, he had visible red marks on his neck (Dkt. 29-5 at p. 10, Interrogatory No. 9), and sustained psychological injury requiring medical treatment (Id. at p. 12, Interrogatory Nos. 13, 14).

Plaintiff's affidavit and answers to Defendants' interrogatories set forth sufficient evidence to create genuine issues of material fact regarding Plaintiff's excessive force claim. Plaintiff's failure to complain of any injury or use of force while he was being transported to, and when he arrived at, the jail does not necessarily rule out that Deputy Gobernik placed Plaintiff in a choke hold, and Deputy Buswell used his taser on Plaintiff. Moreover, the red marks are evidence that force was applied to Plaintiff's neck. Further, although Deputy Buswell attests that if he had used his taser to "perform a drive stun during the brief struggle. . .Plaintiff would have received 2 obvious burn-like marks" (Dkt. 29-2 at p. 7, ¶ 48), there is no evidence that Deputy Buswell or any other individual looked at or examined Plaintiff's groin area, which presumably was covered by clothing,[19] or that utilizing a taser to perform a drive stun always results in "obvious burn-like marks." While the evidence relied on by the Defendants suggests that Plaintiff's physical injuries were comparatively minor, "a court ultimately should decide an excessive force claim 'based on the nature of the force rather than the extent of the injury.'" *Vicks v. Knight*, 380 Fed. Appx. 847, 851 (11th Cir. 2010) (quoting *Wilkins v. Gaddy*, 559 U.S. ___, ___, 130 S. Ct. 1175, 1177 (2010)). *See also Morrison v. Bd. of Trs.*, 583 F.3d 394, 407 (6th Cir. 2009) ("a plaintiff may allege use of excessive force even where the physical contact between the parties did not leave excessive marks or cause extensive physical damage.") (citation and internal quotation marks omitted).

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could find that the Defendants' actions constituted excessive force in violation of the Fourth Amendment. As such, qualified immunity is not available to Defendants because Plaintiff's right to be free from excessive force was clearly established before November 2008. *Davis v. Williams*, 451 F.3d 759, 767 (11th

---

[19]Plaintiff attests that he "was in [his] underwear" at the time of the arrest (Dkt. 30 at p. 23, ¶ 14).

25

Cir. 2006) ("It is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment."). *See also Dobbins v. Giles*, 451 Fed. Appx. 849, 851 (11th Cir. 2012) (unpublished opinion) ("[W]hen a plaintiff making an excessive force claim 'has alleged facts sufficient to survive a motion to dismiss or a motion for summary judgment' demonstrating that the officer used force maliciously and sadistically to cause harm, he has necessarily established the two prongs required to defeat a defense of qualified immunity.") (quoting *Skrtich v. Thornton*, 280 F.3d 1295, 1301 (11th Cir. 2002)). Therefore, Defendants' request for qualified immunity on Plaintiff's excessive force claims is denied.

## C. Conspiracy to Deprive Constitutional Rights

Plaintiff alleges that Defendants conspired with each other to violate his Fourth Amendment rights (Dkt. 1 at pp. 13-16). Specifically, Plaintiff alleges that Defendants entered into an agreement with each other "to 'create' probable cause after the arrest had been made so that it would appear that probable cause was established before the arrest." (Id. at p. 13, ¶ 62; p. 15, ¶ 69).

In their motion for summary judgment, Defendants first argue that because they were both employees of the HCSO at the time of the alleged conspiracy, a conspiracy between them was a legal impossibility under the intra-corporate conspiracy doctrine (Dkt. 29 at pp. 20-21).[20] Defendants are correct. Both Defendants were employees of the HCSO (Dkt. 29-1 at p. 1, ¶ 1; Dkt. 29-2 at p. 1, ¶

---

[20]"The intracorporate conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy. Simply put, under the doctrine, a corporation cannot conspire with its employees, and its employees, when acting in the scope of their employment, cannot conspire among themselves." *McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc). "The doctrine applies to public entities such as the City and its personnel." *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001) (citation omitted). *See also Tillman v. Orange County*, 519 Fed. Appx. 632, 636 (11th Cir. 2013) (unpublished) ("The intracorporate conspiracy doctrine also applies to public entities, like the Orange County Sheriff's Office, and its personnel.").

1).  Plaintiff alleges that Defendants conspired only with each other (Dkt. 1 at pp. 13-16).[21]  The

subject of their alleged conspiracy involves a job-related function within their scope of employment

as Deputies.  As such, the intra-corporate conspiracy doctrine bars Plaintiff's conspiracy claim.  *See*

*Denney*, 247 F.3d  at 1190-91; *Grider v. City of Auburn*, 618 F.3d 1240 (11th Cir. 2010).

Moreover, even if the intra-corporate conspiracy doctrine is inapplicable, Plaintiff cannot

succeed on his conspiracy claim.  To the extent Plaintiff alleges that Defendants violated 42 U.S.C.

§ 1985, he has not alleged or presented evidence of a discriminatory animus as a basis for the

conspiracy.[22]  A claim brought pursuant to 42 U.S.C. § 1985(3) must allege: "(1) a conspiracy; (2)

for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal

protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in

furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or

deprived of any right or privilege of a citizen of the United States." *Park v. City of Atlanta*, 120 F.3d

1157, 1161 (11th Cir. 1997) (citations omitted).  In order to prove a private conspiracy in violation

of § 1985(3),[23] a plaintiff must show "(1) that some racial, or perhaps otherwise class-based,

invidiously discriminatory animus lay behind the conspirators' action, and (2) that the conspiracy

aimed at interfering with rights that are protected against private as well as official encroachment."

*Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267-78 (1993) (internal quotations and

---

[21] The Court notes that in its October 24, 2012 Order denying Defendants' Motion to Dismiss, it found that the Complaint alleged that Defendants conspired with Crowther (see Dkt. 24 at p. 2).  That finding was erroneous. Although the Complaint alleges that Defendants instructed Crowthers "to misrepresent that the tractor stolen from Home Depot was the same tractor in the possession of" Plaintiff (Dkt. 1 at p. 13, ¶ 63; p. 15, ¶ 69), the Complaint does not allege that Defendants conspired or reached an agreement with Crowthers to manufacture probable cause.

[22] See Dkt. 30 at p. 15 ("the prungs [sic] under 1985 are considered satisfied.").

[23] Plaintiff has not identified the specific subsection of § 1985 under which he proceeds. The court assumes, however, that it is subsection (3) "Depriving persons of rights or privileges[.]"

citations omitted). Plaintiff has not presented any allegation, let alone evidence, which would suggest that a material issue of fact exists as to whether Defendants' acts were motivated by racial or class-based invidiously discriminatory animus.

To the extent Plaintiff brings his conspiracy claim pursuant to 42 U.S.C. § 1983, he has not presented evidence of an agreement between Defendants to manufacture probable cause after Plaintiff's arrest. "To establish a prima facie case of § 1983 conspiracy, a plaintiff must show, among other things, that the defendants reached an understanding to violate his rights." *Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1283 (11th Cir. 2002) (quotations and citation omitted). "For a conspiracy claim to survive a motion for summary judgment, a mere scintilla of evidence will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Id.* at 1284 (quotations and citation omitted).

On this record, Plaintiff has not shown any evidence of an agreement between Defendants, or between Defendants and Crowther, to manufacture probable cause after the arrest. In his Complaint, Plaintiff alleges that in furtherance of their conspiracy, Defendants "wrote factually conflicting police reports[,]" and "instructed David Crowther [sic] to misrepresent that the tractor stolen from Home Depot was the same tractor in the possession of" Plaintiff (Dkt. 1 at pp. 13, 15).

Plaintiff, however, has not provided evidence supporting either of these allegations. Plaintiff has failed to identify what reports were conflicting, and explain how they conflicted. Further, Plaintiff has not identified evidence demonstrating that Defendants instructed Crowthers to misrepresent that the tractor had been stolen. Deputy Buswell and Crowthers' affidavits indicate that after Deputy Buswell contacted Crowthers, Crowthers informed Deputy Buswell that the serial number on the tractor matched information in Home Depot's records which indicated that the tractor

28

had been stolen (Dkts. 29-2 at p. 3, ¶¶ 15-16; 29-3 at p. 2, ¶¶ 5-6).  According to the affidavits, it was only after Crowthers informed Deputy Buswell that the tractor had been stolen that Deputy Buswell recommended that Crowthers contact the PCSO to report that the tractor had been stolen (Dkts. 29-2 at p. 3, ¶ 19; 29-3 at p. 2, ¶ 7).  Plaintiff has presented no contrary evidence.  Evidence that Deputy Buswell recommended that Crowthers contact the PCSO and report the tractor stolen, after Crowthers informed Deputy Buswell that Home Depot's records showed that the tractor was stolen, does not tend to show that Defendants and Crowthers agreed to manufacture probable cause.

Because Plaintiff has failed to present evidence that supports the existence of a conspiracy to violate Plaintiff's constitutional rights, summary judgment in favor of Defendants is appropriate. *See McAndrew v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) ("It is by now axiomatic that a conspiracy requires a meeting of the minds between two or more persons to accomplish a common and unlawful plan.").

ACCORDINGLY, Defendants' Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Dkt. 29) is **GRANTED** in part and **DENIED** in part.  The motion is **GRANTED** on Counts V and VI of the Complaint, Plaintiff's conspiracy to violate civil rights claims.  The motion is otherwise **DENIED**.

**DONE and ORDERED** in Tampa, Florida, on _March 27th_, 2014.

JAMES D. WHITTEMORE
United States District Judge

SA: sfc
Copy to: Plaintiff *pro se*
        Counsel of Record

29